FILED

2012 NOV 20 AM 9:12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

Case No. 3:12-cr-198-J-25MCR

v.

Count 1:   18 U.S.C. § 371

LORRAINE BROWN

## INFORMATION

The United States Attorney charges:

### COUNT ONE
(Conspiracy to Commit Mail and Wire Fraud)

#### Background

At all times material herein, unless otherwise specified:

1. LORRAINE BROWN, a resident of Georgia, founded DocX LLC (hereinafter, "DocX") in the 1990s in Ohio. In the early 2000s, Brown relocated the bulk of DocX's operations to Alpharetta, Georgia (the Alpharetta operations of DocX LLC are referred to herein as "DocX" regardless of the time frame).

2. In mid-2005, Jacksonville, Florida based Fidelity National Financial, Inc. ("FNF") purchased DocX from Brown and her partners. Through corporate reorganizations within FNF, DocX later fell under ownership of Fidelity National Information Services, Inc. ("FNIS"). In mid-2008, FNIS spun off a number of business lines into a new publicly-traded entity, Lender Processing Services, Inc. ("LPS"), based in Jacksonville, Florida. At that time, DocX was rebranded as

"LPS Document Solutions, a Division of LPS." Following this spin-off, Brown was the President and Senior Managing Director of LPS Document Solutions, which constituted DocX's operations in Alpharetta. At all times relevant to this Information, Brown was the chief executive of the DocX operations.

3. DocX's main clients were residential mortgage servicers (the "servicers"), which typically undertake certain actions for the owners of mortgage-backed promissory notes. These duties include, among others, accepting and recording mortgage payments, paying taxes and insurance from borrower escrow accounts, and conducting or supervising the foreclosure process when necessary.

4. Servicers hired DocX to perform a number of these actions, including assisting in creating and executing mortgage-related documents filed with recorders' offices. The majority of documents created and recorded by DocX between 2003 and 2009 were lien releases, which evidence payment in full of a mortgage-backed note. DocX also executed mortgage assignments, which purport to transfer the note's ownership interest. Mortgage assignments were typically created during the foreclosure process, and the volume of these documents dramatically increased at DocX during the foreclosure crisis of 2007 to 2009. DocX also signed lost note and lost assignment affidavits related to mortgage documents.

5. From at least March 2003 through November 2009, Brown marketed DocX as an outsourcing solution to mortgage servicers for filing and recording mortgage documents throughout the United States. Brown represented to clients that DocX had robust quality control procedures in place to ensure a thorough and proper signing, notarization, and recordation process. As a result of these representations, clients hired DocX.

6. When hiring DocX to sign documents, servicers typically issued special corporate resolutions delegating document execution authority to specific, authorized, and trained personnel at DocX. The DocX employees who were given express signing authority from DocX's clients and who, as represented by Brown, were purportedly trained to ensure that the clients' documents were properly created, signed, and notarized were called "Authorized Signers." These documents were then generally recorded by DocX with the appropriate local property recorders' offices throughout the country.

## The Conspiracy and its Objects

7.  From in or about 2005 through in or about October 2009 at Jacksonville in the Middle District of Florida, Alpharetta, Georgia, and elsewhere throughout the United States,

LORRAINE BROWN,

the defendant herein, did knowingly and willfully combine, conspire, confederate and agree with others to commit certain offenses, to wit:

a.  execute and attempt to execute a scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, by utilizing the United States mail and private and commercial interstate carriers, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1341; and,

b.  execute and attempt to execute a scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, by transmitting and causing to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, visual pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Manner and Means of the Conspiracy and Scheme and Artifice

8.      The manner and means by which Brown, co-conspirators, and others sought to accomplish the purposes and objectives of the conspiracy include, but are not limited to, the following:

   a.      Beginning in or about 2005, employees of DocX, at the direction of Brown and others, began forging and falsifying signatures on the mortgage-related documents that they had been hired to prepare and file with property recorders' offices throughout the United States.

   b.      Unbeknownst to DocX's clients, the Authorized Signers were instructed by Brown and other DocX employees to allow other, unauthorized, DocX employees to sign, and to have the document notarized as if the actual Authorized Singer had executed the document.

   c.      Brown also hired temporary workers to sign as Authorized Signers. These temporary employees worked for much lower costs and without the quality control represented by Brown to DocX's clients.  In fact, some of these temporary workers were able to sign thousands of documents a day. These mortgage-related documents were fraudulently notarized by DocX employees even though the Authorized Signer did not actually sign the document.

   d.      These unauthorized signing and notarization practices allowed DocX, Brown, and others to generate greater profit and make more money.

e. After these false documents were signed and notarized, DocX filed them through the mails or by electronic methods with local county property records offices. Many of these documents, particularly mortgage assignments and lost note or assignment affidavits, were later relied upon in court proceedings, including property foreclosures and in federal bankruptcy court. Brown knew that these property recorders, as well as those who received the documents such as courts, title insurers, and homeowners, relied on these documents as genuine.

f. Brown and others also took various steps to conceal their actions from detection from clients, LPS corporate headquarters, law enforcement authorities, and others.

## Overt Acts

9. On or about August 13, 2008, Brown caused to be delivered to Jacksonville, Florida, by commercial interstate carrier from DocX, an Assignment of Mortgage filed with the Clerk of Circuit Court, Duval County, Florida, which Assignment of Mortgage had been executed on August 12, 2008, with false and fraudulent signatures of Authorized Signers and which bore a false and fraudulent notarization attestation.

10. On or about February 23, 2009, Brown caused a DocX business client to make a payment by electronic funds transfer of $357,185.60, in

interstate commerce, from a financial institution in Iowa to a DocX account held at a financial institution in Georgia.

In violation of Title 18, United States Code, Section 371.

ROBERT E. O'NEILL
United States Attorney

By: *[signature]*
MARK B. DEVEREAUX
Assistant United States Attorney

*[signature]*
MAC D. HEAVENER, III
Assistant United States Attorney
Deputy Chief, Jacksonville Division

DENIS McINERNEY
Chief, Fraud Section - Criminal Division
United States Dept. of Justice

By: *[signature]*
RYAN ROHLFSEN
Trial Attorney, Fraud Section

*[signature]*
GLENN LEON
Assistant Chief, Fraud Section